289 F.3d 49
 Tina PHIFER, for herself and on behalf of her infant daughter, Amkia Phifer, Plaintiff-Appellant,
v.
CITY OF NEW YORK, Rudolph Giuliani, Mayor of the City of New York, in his official and individual capacities, New York City Administration for Children's Services, Children's Aid Society, Nicholas Scopetta, Commissioner of the New York City Administration for Children's Services, in his official and individual capacity, Hattie L. Lucas, Director of the Office of the Ombudsman for the Administration for Children's Services, in her official and individual capacities, Delano Saunders, Christine Gabriel, Ellen Lauter, Edward Nichols M.D., The Montefiore Medical Center, Beth Yurdin, Richard Rosencrantz, Dyan Hes, Henry Adams, Paul Levy, William Spivak, Aeri Moon, John Doe, an employee of the aforesaid defendants whose identities are not presently known, and Jane Doe, an employee of the aforesaid defendants whose identities are not presently known, Defendants-Appellees.
 Docket No. 01-7131.
 United States Court of Appeals, Second Circuit.
 Argued: November 28, 2001.
 Decided: April 19, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Ronald R. Benjamin, Law Offices of Ronald R. Benjamin, New York, NY, for Plaintiff-Appellant.
 Paul H. Aloe, Rubin Baum, LLP, New York, NY, for Defendant-Appellee The Children's Aid Society.
 Howard R. Cohen, Sedgwick, Detert, Moran & Arnold, New York, NY, for Defendants-Appellees The City of New York, Rudolph Giuliani, the New York City Administration for Children's Services, Hattie Lucas, Nicholas Scopetta, Delano Saunders, and Christine Gabriel.
 Rosanne Leacy, Aaronson, Rappaport, Feinstein & Deutsch, LLP, New York, NY, for Defendants-Appellees The Montefiore Medical Center, Beth Yurdin, Richard Rosencrantz, M.D., Dyan Hes, M.D., Henry Adam, M.D., William Spivak, M.D., and Aeri Moon, M.D.
 Peter I. Livingston, Rosen & Livingston, New York, NY, for Defendant-Appellee Ellen Lauter.
 Robert G. Vizza, Geisler & Gabriele, LLP, Garden City, NY, for Defendant-Appellee Edward Nichols, M.D.
 Before: JACOBS, SACK, and KATZMANN, Circuit Judges.
 Judge JACOBS concurs in part and dissents in part in a separate opinion.
 KATZMANN, Circuit Judge.
 
 Introduction
 
 1
 Plaintiff-Appellant Tina Phifer ("Phifer") appeals from a judgment of the United States District Court for the Southern District of New York (Denny Chin, J.), dismissing her federal claims for lack of subject matter jurisdiction based on the Rooker-Feldman doctrine. Phifer filed the instant civil rights action under 42 U.S.C. §§ 1981 and 1983 on behalf of herself and her minor daughter Amkia, alleging that the defendants violated their constitutional rights when they removed Amkia from Phifer's custody and deprived Phifer of the custody of her daughter for over two years. We agree with the district court that the Rooker-Feldman doctrine bars any challenge by the plaintiff to the state court's rulings regarding neglect, custody and visitation. We further find that Rooker-Feldman bars the plaintiff's claim of racial discrimination by certain defendants during the pendency of the family court proceedings. However, Phifer's claim that the initial decision by the medical defendants and the New York City Administration for Children's Services ("ACS") to remove Amkia from her mother's custody, made during the August 28 to September 12, 1997 time period, was motivated by racism is not barred by Rooker-Feldman. As for the other claims stemming from Amkia's stay at defendant The Montefiore Medical Center ("Montefiore" or "the hospital") from August 28 to September 12, 1997, we find that Phifer's substantive due process claim and Amkia's Fourth Amendment claim are barred by Rooker-Feldman, but that Phifer and Amkia's procedural due process claims are not precluded. Finally, we conclude that Rooker-Feldman does not bar Amkia's substantive due process claim based on allegations that she was mistreated while in the custody of defendants ACS and the Children's Aid Society ("CAS"). We therefore affirm the district court's judgment in part, reverse the judgment in part, and remand for further proceedings consistent with this opinion.
 
 Background
 
 2
 Amkia was diagnosed with ulcerative colitis, a serious, chronic and life-threatening disease, in November of 1996, when she was eight years old. On August 20, 1997, Phifer took Amkia to see Dr. Edward Nichols, Amkia's primary care physician, and explained that Amkia had experienced blood in her stool and was fatigued. A blood test indicated that Amkia was severely anemic. On August 22, 1997, Dr. Nichols advised Phifer that Amkia was in urgent need of a blood transfusion and that Phifer should take Amkia to the emergency room to be admitted for an immediate blood transfusion. Phifer took Amkia to Montefiore that evening, at which time it was determined that Amkia's hemocrit level had dropped to a dangerously low level. Amkia received a blood transfusion that night. Thereafter, a disagreement arose as to how Amkia's care should proceed. According to Phifer, Amkia was out of danger and not in any imminent risk of harm shortly after the blood transfusion. Phifer alleges that the medical defendants, including defendants Dyan Hes, Paul Levy, and William Spivak, began blaming her for Amkia's medical condition and insisting that Amkia was in imminent danger in order to cover up Dr. Nichols's alleged malpractice or because of "racist assumptions that because plaintiff... was of Afro-American decent [sic] she was not qualified to make reasonable parental decisions about recommendations for treatment...." Pl.'s Compl. ¶ 31.
 
 
 3
 Phifer alleges that Amkia's condition continued to deteriorate while in the care of the medical defendants. Phifer further alleges that when she sought to have Amkia discharged from Montefiore on August 28, 1997, hospital security guards were placed outside Amkia's hospital room and in front of the elevators on that floor. According to the plaintiff, defendant Beth Yurdin, a hospital social worker, told Phifer she could not leave the hospital with Amkia and filed a report of suspected child mistreatment with ACS on August 28, 1997, stating that the plaintiff had attempted to leave the hospital with Amkia and was preventing Amkia from receiving necessary medical attention for her ulcerative colitis.
 
 
 4
 Over the next several days, the hospital staff refused to allow Phifer to take Amkia from the hospital and threatened to call a child protective agency in order to obtain plaintiff's consent to additional medical procedures. On September 6, 1997, after Amkia's parents would not consent to further medical procedures, Yurdin made a second report to ACS, stating that the plaintiff was attempting to remove Amkia from the hospital. On September 12, 1997, defendant Delano Saunders, a caseworker for ACS, filed a petition in the Bronx County Family Court alleging that Amkia was in imminent danger and that Phifer was neglecting Amkia's medical condition. On this same day, the family court granted temporary custody of Amkia to ACS so she could receive the necessary medical treatment. During the next two months, Amkia received medical treatment at Montefiore. Upon release from the hospital, Amkia was placed with her maternal grandparents under the supervision of ACS.
 
 
 5
 The neglect case against Phifer proceeded in family court. At a November 24, 1997 hearing, the family court judge found that Phifer had engaged in "[r]epeated bizarre statements and behavior," ordered a competency evaluation of Phifer, and adjourned the case until February 1998 for fact finding. Tr. of Apr. 19, 1999 Hr'g at 20. Amkia was readmitted to Montefiore in February of 1998 due to a deterioration in her condition, and she remained in the hospital until April 9, 1998. On February 17, 1998, the court heard ACS's request that Amkia be returned to ACS custody because Amkia's condition had deteriorated while under her grandparents' care. Upon discharge from Montefiore, Amkia was placed in foster care through CAS.
 
 
 6
 In March and April of 1998, the family court held evidentiary hearings pursuant to Phifer's application under section 1028 of the Family Court Act for the return of Amkia to her custody. After three days of testimony, the family court denied Phifer's request for custody, concluding that Amkia would be in imminent risk to her health and life if she were returned to her mother. On August 27, 1998, Phifer petitioned for a writ of habeas corpus for the return of Amkia. This motion was also denied. On September 9, 1998, ACS moved to suspend Phifer's visitation with Amkia. The family court judge issued an order of protection ordering Phifer to stay away from Amkia and her foster mother, but urged the parties to reach a resolution on the issue of visitation. On September 30, 1998, Phifer submitted an order to show cause seeking a variety of relief, which was denied. At some point thereafter, visits between Amkia and her mother resumed.
 
 
 7
 On April 16, 1999, the State Supreme Court dismissed a second petition by Phifer for a writ of habeas corpus for the custody of Amkia and remanded the petition to family court. The family court denied the order to show cause and petition for a writ of habeas corpus on April 19, 1999. The court stated that "[t]here is no doubt whatsoever in this Court's mind that Anthea [sic] is lawfully in the custody of the Administration for Children's Services." Tr. of Apr. 19, 1999 Hr'g at 13. The court stated that Amkia was removed by ACS from her mother in a lawful manner and that the court previously had an opportunity to review the continued lawfulness of that custody during the three-day section 1028 hearing, which resulted in a conclusion that Amkia would be in imminent risk to her health and life if she were returned to her mother. The court also denied Phifer's order to show cause, noting that the court had no bias against Phifer and that the delays in the case were caused in large part by Phifer and her several attorneys. The court also rejected Phifer's accusations of racism against those involved in the proceedings.
 
 
 8
 Fact finding in the neglect case against Phifer continued. On November 8, 1999, the family court judge rendered his final decision and concluded that ACS met its burden of proving by a preponderance of the evidence that Amkia's parents neglected her. The court found that Phifer neglected Amkia from December 1996 to approximately August 20, 1997 by failing to provide Amkia with adequate medical care despite knowing that Amkia was diagnosed with ulcerative colitis in November of 1996, and that this failure resulted in the impairment of Amkia's physical condition. Furthermore, the court found that from the time Amkia was hospitalized at the Montefiore Medical Center on August 22, 1997 until the petition was filed on September 12, 1997, Phifer interfered with the medical treatment provided by Amkia's doctors and this interference placed Amkia's physical condition in imminent danger.
 
 
 9
 Phifer began the instant civil rights action in the United States District Court for the Southern District of New York on June 21, 1999. Her complaint alleges violations of the First, Fourth, Fifth, Ninth, and Fourteenth Amendments of the Constitution, as well as state law claims for medical malpractice, lack of informed consent, and breach of contract.[1] The district court dismissed the plaintiff's request for injunctive relief on September 16, 1999 pursuant to the Younger doctrine. Phifer v. City of New York, No. 99 Civ. 4422, 1999 WL 722013, at *2-*3 (S.D.N.Y. Sept.16, 1999) ("Phifer I"). After further briefing, the district court dismissed the plaintiff's claims for damages, holding that the federal court lacked subject matter jurisdiction over the claims pursuant to the Rooker-Feldman doctrine. Phifer v. City of New York, No. 99 Civ. 4422, 2001 WL 8597, at *4 (S.D.N.Y. Jan.3, 2001) ("Phifer II"). The court found that all of the plaintiff's claims were "inextricably intertwined" with the various state court decisions related to the neglect proceedings against Phifer and that her claims could not be heard without a review of the rulings of the family court. Id. Because it dismissed under Rooker-Feldman, the court did not reach whether dismissal was warranted on alternative grounds raised by the defendants. Id.; see also Phifer I, 1999 WL 722013, at *3 (referring to defendants' argument that Phifer's § 1983 claim for money damages should be dismissed for failure to state a claim or under the immunity provisions of the Child Protective Services Act). Amkia was returned to her mother's custody in January of 2001 after Phifer complied with a number of requirements established for Amkia's care.
 
 Discussion
 
 10
 "A challenge under the Rooker-Feldman doctrine is for lack of subject matter jurisdiction." Moccio v. New York State Office of Court Admin., 95 F.3d 195, 198 (2d Cir.1996). We review de novo a district court's determination that, as a matter of law, it lacks jurisdiction over the case. Rivers v. McLeod, 252 F.3d 99, 101 (2d Cir.2001) (per curiam); Moccio, 95 F.3d at 198. Because the defendants' challenge is to subject matter jurisdiction, we may consider materials extrinsic to the complaint. United States v. Vazquez, 145 F.3d 74, 80 (2d Cir.1998). A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).
 
 
 11
 This appeal requires that we determine whether the Rooker-Feldman doctrine bars the lower federal courts from reviewing the plaintiff's constitutional claims. We do not examine here the merits of those claims. The Rooker-Feldman doctrine holds that inferior federal courts lack subject matter jurisdiction "over cases that effectively seek review of judgments of state courts and that federal review, if any, can occur only by way of a certiorari petition to the Supreme Court." Moccio, 95 F.3d at 197. In Rooker v. Fidelity Trust Company, 263 U.S. 413, 416, 44 S.Ct. 149, 68 L.Ed. 362 (1923), the Supreme Court explained that the jurisdiction of the district courts is strictly original and no federal court, other than the Supreme Court, can consider a claim to reverse or modify a state court judgment. In District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), the Supreme Court expanded upon this principle and held that to the extent that the plaintiff's claims before the district court were "inextricably intertwined" with the state court's determinations, the district court did not have jurisdiction to entertain those claims. Id. at 483 n. 16, 103 S.Ct. 1303.
 
 
 12
 Our Circuit has noted that the Supreme Court has provided little guidance in determining when claims are "inextricably intertwined" with a prior state court judgment and that this lack of guidance has resulted in inconsistency in the lower federal courts. Moccio, 95 F.3d at 198. We have held that "[i]f the precise claims raised in a state court proceeding are raised in the subsequent federal proceeding, Rooker-Feldman plainly will bar the action. On the other hand, ... where the claims were never presented in the state court proceedings and the plaintiff did not have an opportunity to present the claims in those proceedings, the claims are not `inextricably intertwined' and therefore not barred by Rooker-Feldman." Id. at 198-99.
 
 
 13
 The Moccio court recognized that not all cases fall neatly into one of these extremes. Id. at 199. To address situations that fall between these two poles, Moccio articulated the following definition: "`inextricably intertwined' means, at a minimum, that where a federal plaintiff had an opportunity to litigate a claim in a state proceeding ..., subsequent litigation of the claim will be barred under the Rooker-Feldman doctrine if it would be barred under the principles of preclusion." Id. at 199-200 (citing Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 25, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) (Marshall, J., concurring) ("[T]he federal claim is inextricably intertwined with the state-court judgment if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it.")); see also Rivers, 252 F.3d at 101 (quoting Moccio for the definition of "inextricably intertwined"). Thus, the court must consider two categories of preclusion: res judicata and collateral estoppel. Moccio, 95 F.3d at 200; People United for Children, Inc. v. City of New York, 108 F.Supp.2d 275, 286 (S.D.N.Y. 2000). While res judicata does not bar the plaintiff's section 1983 claims in the instant case as the family court does not have the power to award monetary damages, id. at 287; see also Fay v. S. Colonie Cent. Sch. Dist., 802 F.2d 21, 29 (2d Cir.1986) (holding that plaintiff was not barred from pursuing his section 1983 claims for damages because the Article 78 court was without power to award monetary damages), collateral estoppel can be applied to the plaintiff's section 1983 claims to determine whether they are barred by Rooker-Feldman, Moccio, 95 F.3d at 200; People United for Children, 108 F.Supp.2d at 287.
 
 
 14
 Under New York law, collateral estoppel will apply only if "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." Moccio, 95 F.3d at 200 (citation and internal quotations marks omitted). The court in Moccio applied the collateral estoppel test to the plaintiff's section 1983 claims and found that Rooker-Feldman barred all of the plaintiff's causes of action because the issues raised by the plaintiff in his federal action challenging his termination were previously decided by the state court in his Article 78 proceeding. Id. at 200-02.
 
 
 15
 Two years after deciding Moccio, the Second Circuit considered whether the Rooker-Feldman doctrine "extends beyond preclusionary rules." Hachamovitch v. DeBuono, 159 F.3d 687, 694-95, 696 (2d Cir.1998) (holding that Rooker-Feldman did not bar jurisdiction over due process challenge to the unavailability of any procedure for reopening a concluded physician disciplinary proceeding). The court in Hachamovitch noted that since Feldman, the Supreme Court has cautioned the courts against "categorical diminution (via court-constructed doctrines) of the power granted to the federal courts by Congress" and concluded that "we are disinclined at present to extend or amplify the Rooker-Feldman doctrine beyond the `minimum' specified in Moccio, absent circumstances not presented by this case." Id. at 696. The court left open the possibility that "[a] case might arise that would directly challenge a state court judgment in a way that the Supreme Court clearly envisioned would be barred by Rooker-Feldman and yet for some reason not be precluded." Id. at 696 n. 3. We do not think this is such a case, and thus we apply the collateral estoppel elements to the plaintiff's claims.
 
 
 16
 
 Plaintiff's Claims Directly Attacking the Family Court's Decisions Regarding Custody, Neglect, and Visitation Are Barred by Rooker-Feldman
 
 
 
 17
 This court may not review the family court's determinations regarding custody, neglect and visitation, as those issues were decided by the family court after providing Phifer a full and fair opportunity to litigate those issues. See Moccio, 95 F.3d at 197 (stating that inferior federal courts do not have subject matter jurisdiction over cases that effectively seek review of judgments of the state courts). During the course of the family court proceedings, the family court found, inter alia, that (1) Phifer had neglected her daughter's medical condition from December of 1996 to August 20, 1997; (2) this neglect resulted in the impairment of Amkia's health; (3) Phifer interfered with the doctors' attempts to provide Amkia with necessary medical care during her initial stay at Montefiore from August 22, 1997 to September 12, 1997; (4) this interference placed Amkia in imminent danger; (5) Amkia was properly in ACS custody; and (6) Amkia would be in imminent risk to her health and life if she were returned to her mother. The family court also made determinations as to Phifer's visitation rights and at one point ordered Phifer to stay away from Amkia and her foster parents. Phifer nevertheless directly attacks the family court's findings regarding custody, neglect, and visitation in her complaint. Phifer's request for an order from the district court directing ACS to return Amkia to her custody illustrates that her complaint is an attempt to obtain relief from the federal court that she has been denied in the state court proceedings. There is no question that Rooker-Feldman bars Phifer's challenges to the family court's decisions regarding custody, neglect, and visitation.
 
 
 18
 Next, we must determine whether Phifer's other claims are "inextricably intertwined" with the issues decided by the family court and thus also barred by Rooker-Feldman. See Moccio, 95 F.3d at 198-99.
 
 
 19
 
 Plaintiff's Claims of Racial Discrimination
 
 
 
 20
 Phifer asserts claims of racial discrimination under the Fourteenth Amendment against the medical defendants and the City defendants. The defendants counter that Phifer's claims of racial discrimination are barred by the Rooker-Feldman doctrine because they were considered and rejected by the family court. The record shows that the family court judge made the following statement at an April 19, 1999 hearing on Phifer's motion for an order to show cause and motion for a writ of habeas corpus:
 
 
 21
 I also should note that I am troubled by the baseless and meritless contentions by both Mr. Benjamin and Ms. Phifer in their present papers, that Ms. Phifer is being treated in the manner she claims that she's being treated, because they're great (inaudible).[2]
 
 
 22
 Both Mr. Benjamin and Ms. Phifer made some representations, on information and belief. Notably, however, the source of such information and the basis for any such beliefs are nowhere stated in these papers. And that is entirely understandable because, in fact, in this courtroom, nobody associated with these proceedings has attempted to or has treated Ms. Phifer and [Amkia] in the manner claimed by Ms. Phifer.
 
 
 23
 I think the allegations are hurtful. They are untrue. They serve no useful purpose. And I am sorry, that, in fact, they were raised. Because there is no truth whatsoever to them.
 
 
 24
 Tr. of Apr. 19, 1999 Hr'g at 26-27. To the extent that Phifer alleges in her complaint that certain defendants who were associated with Amkia's case in the family court were motivated by racism in their recommendations, representations, or requests to the family court, we find that Rooker-Feldman bars these claims. The family court rejected Phifer's claims of racism, and thus this question was "actually and necessarily decided" by a prior court. Moccio, 95 F.3d at 200 (citation and internal quotation marks omitted). Phifer has not met her burden of proving that the family court did not provide a full and fair opportunity to litigate this issue. See id. at 201. The court considered Phifer's papers on this issue and also had the benefit of having previously conducted a three-day hearing on Phifer's request for custody of Amkia, at which the time the court was able to assess the credibility of several witnesses involved in Amkia's case.
 
 
 25
 However, it does not appear, based on the record before us, that the family court considered whether the initial decision by the medical defendants and ACS to remove Amkia from her mother's custody, made during the August 28 to September 12, 1997 time period, was motivated, at least in part, by racism. Phifer alleges that the City has a policy that presumes that African-American parents are unfit and that children of African-American parents are "taken into custody without the time, effort, and resources that would be utilized in an investigation alleging the same type of neglect or abuse when committed by a white parent." Pl.'s Compl. ¶ 63. As to the medical defendants, Phifer alleges that they determined that Phifer was not able to make decisions about her daughter's care based on racist assumptions and that these assumptions led the medical defendants to contact ACS. Because the family court did not, as far as we know, "actually and necessarily decide[]" the issue of whether the decision to remove Amkia was motivated by racism, Rooker-Feldman would not bar this claim. See Moccio, 95 F.3d at 200 (citation and internal quotations marks omitted); see also Ernst v. Child and Youth Servs. of Chester County, 108 F.3d 486, 492 (3d Cir.) (finding that plaintiff's claim that defendants violated her right to substantive due process by making recommendations to the state court out of malice and personal bias were not barred by Rooker-Feldman as plaintiff did not articulate those concerns in constitutional due process terms in the state court and plaintiff's substantive due process rights were never decided by the state court), cert. denied, 522 U.S. 850, 118 S.Ct. 139, 139 L.Ed.2d 87 (1997).
 
 
 26
 At first blush, such a determination that Rooker-Feldman does not bar claims of racial discrimination with regard to the initial decision to remove Amkia might seem inconsistent with our conclusion that the family court rejected Phifer's claims of racism in the defendant's recommendations, representations or requests to the family court. However dubious the claims might appear with regard to the initial decision to remove in light of the family court's determination with respect to the proceedings, we cannot find at this stage that Rooker-Feldman bars those claims. First, as far as we can discern, the family court's statements were directed only at those participating in the court proceeding itself; such individuals may have been different from those involved in the initial decision to remove Amkia. Second, the initial decision to remove was made nineteen months before the proceeding at which the family court "actually and necessarily decided" the specific question as to whether those participating in those hearings were motivated by racism. Although one might be skeptical about the claims of racial discrimination regarding the initial decision to remove Amkia, Rooker-Feldman cautions that at this point we cannot bar them when they have not been "actually and necessarily decided" by a prior court. Rather, we are constrained to leave to the district court the task of further evaluating those claims.[3]
 
 
 27
 We note that even if the district court were to find that Phifer's claim has merit— that is, that the medical defendants and ACS suspected Phifer of neglect more readily because of her race and removed Amkia more hastily than they would have if Phifer were white—that decision would not call into question the family court's decisions regarding neglect, custody and visitation as those decisions are based on the parents' conduct, the harm to the child, and what is in the best interest of the child. See Ernst, 108 F.3d at 492 ("Neither an adjudication of dependency nor a determination of the appropriate disposition of a dependent child is based on the intentions or states of mind of the party seeking the dependency adjudication."); see generally N.Y. Fam. Ct. § 1012(e), (f) (defining "abused child" and "neglected child"); Friederwitzer v. Friederwitzer, 55 N.Y.2d 89, 447 N.Y.S.2d 893, 895-97, 432 N.E.2d 765 (1982) (discussing a child's best interest); In re Christopher "JJ", 281 A.D.2d 720, 721 N.Y.S.2d 692, 693-95 (3d Dep't 2001) (discussing neglect standard). Logically, the fact that the family court found that the accusations of neglect were true does not necessarily mean that the defendants' initial suspicions were not colored by racism. Indeed, in order to succeed on her equal protection claim, Phifer need not show that the medical defendants or City defendants were "motivated solely, primarily, or even predominantly by race." People United for Children, 108 F.Supp.2d at 296 (citing United States v. Yonkers Bd. of Educ., 837 F.2d 1181, 1216-17 (2d Cir. 1987), cert. denied, 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988)). In other words, this would not be a case in which "the federal claim succeeds only to the extent that the state court wrongly decided the issues before it." Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 25, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) (Marshall, J., concurring) (offering a definition of "inextricably intertwined").[4]
 
 
 28
 
 The Fourth Amendment, Procedural Due Process, and Substantive Due Process Claims Arising from Amkia's Initial Stay at the Montefiore Medical Center
 
 
 
 29
 Phifer claims that the medical defendants violated her substantive and procedural due process rights, as well as Amkia's Fourth Amendment and procedural due process rights, by detaining Amkia in the hospital from August 28, 1997 until September 12, 1997 "without any probable cause that either mother or daughter had committed a crime or that the infant was in any imminent danger of harm...." Pl.'s Compl. ¶ 38. Phifer alleges that on August 28, 1997, two weeks before the family court's September 12, 1997 order temporarily placing Amkia in ACS custody, the plaintiff sought to have Amkia discharged, but that security guards were placed outside Amkia's room and she was "de facto imprison[ed]." Id. As a result of these events and other events, Phifer asserts that she and Amkia were denied their "constitutional rights of privacy, association, due process and [her] parent/child rights." Id. ¶ 89.
 
 
 30
 We find that Rooker-Feldman bars Phifer's substantive due process claim, as well as Amkia's Fourth Amendment claim. In considering a substantive due process claim in this case, the federal court would have to determine whether the hospital acted with a "reasonable basis" when it refused to allow Phifer to remove Amkia from the hospital. See Kia P. v. McIntyre, 235 F.3d 749, 758-59 (2d Cir. 2000), cert. denied, ___ U.S. ___, 122 S.Ct. 51, 151 L.Ed.2d 21 (2001). Because the family court determined, after a three-day hearing, that Amkia's parents interfered with her medical care while she was hospitalized at Montefiore from August 22, 1997 to September 12, 1997 and that this interference placed Amkia's physical condition in imminent danger, the state court already decided this issue. Therefore, Phifer's substantive due process claim would require the district court to decide an issue that the family court already decided adversely to Phifer. See Moccio, 95 F.3d at 201. As to the second element of collateral estoppel—a full and fair opportunity to be heard—Phifer has presented no evidence that the three-day hearing held by the family court judge, at which Phifer was represented by counsel and had the opportunity to present evidence, did not provide her with a full and fair opportunity to litigate this issue. Furthermore, Phifer's substantive due process claim could only succeed to the extent that the state court wrongly decided the issue. See Pennzoil, 481 U.S. at 25, 107 S.Ct. 1519 (Marshall, J., concurring). Thus, we find that Phifer's substantive due process claim is inextricably intertwined with the family court's determinations and that the lower federal courts lack jurisdiction to consider this claim.
 
 
 31
 For essentially the same reasons, we find that Rooker-Feldman bars Amkia's Fourth Amendment claim against the medical defendants. A warrantless seizure is reasonable if it is justified by "exigent circumstances." Tenenbaum v. Williams, 193 F.3d 581, 604 (2d Cir.1999), cert. denied, 529 U.S. 1098, 120 S.Ct. 1832, 146 L.Ed.2d 776 (2000). As we explained in Tenenbaum, in child-abuse investigations, the "exigent circumstances" exception permits state actors to remove a child if they "`have reason to believe that life or limb is in immediate jeopardy.'" Id. at 605 (quoting Good v. Dauphin County Soc. Servs. for Children and Youth, 891 F.2d 1087, 1094 (3d Cir.1989)). This standard applies with equal force to neglect cases. As discussed above, the family court found that Phifer's interference with the doctors' ability to treat Amkia during her hospitalization at Montefiore from August 22, 1997 to September 12, 1997 placed Amkia's physical condition in imminent danger. Thus, the family court in essence decided the issue of whether "exigent circumstances" existed to justify a seizure of Amkia under the circumstances and this issue may not be relitigated in federal court.
 
 
 32
 However, Rooker-Feldman does not bar Phifer and Amkia's claim under the Fourteenth Amendment for violations of procedural due process in connection with Amkia's stay at Montefiore from August 28 to September 12, 1997. In situations like the one presented in this case where a parent voluntarily grants temporary custody to the government or a third party, which then refuses to release the child, "the State has the duty to initiate a `prompt' post-deprivation hearing after the child has been removed from the custody of his or her parents." See Kia P., 235 F.3d at 760.[5] Whether Phifer and Amkia received the requisite prompt postdeprivation hearing was not litigated or decided in the state court proceedings. Moreover, a decision by the federal court that Phifer and Amkia were denied a prompt post-deprivation hearing would not call into question any of the state court findings regarding neglect, custody or visitation. See Pennzoil, 481 U.S. at 25, 107 S.Ct. 1519 (Marshall, J., concurring); Rivers, 252 F.3d at 101. Thus, this claim is not inextricably intertwined with the family court findings and may be considered by the district court.
 
 
 Amkia's Substantive Due Process Claim
 
 
 33
 The complaint alleges that Amkia suffered physical and emotional harm while in foster care due to ACS and CAS's failure to supervise Amkia adequately while she was in their custody. The Second Circuit has recognized that a state agency may be liable under the Due Process Clause for failing to protect children in their custody. Doe v. New York City Dep't of Soc. Servs., 649 F.2d 134, 141 (2d Cir.1981) (discussing the "deliberate indifference" standard as applied to agency supervision of foster care), cert. denied, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); see also DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 201 n. 9, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (citing Doe and noting, without reaching the issue, that a "State [might] be held liable under the Due Process Clause for failing to protect children in foster homes from mistreatment at the hands of their foster parents."). Based on the record before us, whether ACS and CAS were deliberately indifferent to Amkia's alleged mistreatment does not appear to have been litigated in the family court. Moreover, a conclusion by the district court in favor of Amkia on this claim would not constitute a reversal or modification of the state court's decisions regarding custody, neglect, and visitation. See Rivers, 252 F.3d at 101 (holding that plaintiff's claim that the Salvation Army deprived his grandson of due process by failing to provide him with adequate medical care while in their custody is not barred by Rooker-Feldman as the issue was not litigated in family court and does not call into question the validity of the family court's decisions regarding custody and visitation). Thus, we find that this claim is not barred by Rooker-Feldman.[6]
 
 Conclusion
 
 34
 For the reasons stated above, we affirm the district court's decision that the Rooker-Feldman doctrine bars the plaintiff's claims directly challenging the state court's rulings regarding neglect, custody and visitation. We also find that Rooker-Feldman bars Phifer's equal protection claim to the extent that it alleges racial discrimination in the family court proceedings. However, we do not think that Rooker-Feldman bars plaintiff's claim that racism played a part in certain defendants' initial decision to remove Amkia from her mother's custody. We further find that Rooker-Feldman bars Phifer's substantive due process claim and Amkia's Fourth Amendment claim based on Amkia's stay at Montefiore from August 28 to September 12, 1997, but does not bar Phifer and Amkia's procedural due process claims based on the events during this time period. Finally, we find that Rooker-Feldman does not bar Amkia's substantive due process claim based on allegations that she was subjected to mistreatment while in ACS and CAS custody due to the agencies' failure to supervise her properly. We remand this case to the district court for further proceedings consistent with this opinion. We emphasize that our decision in this case is limited strictly to addressing the issue of whether the district court can exercise subject matter jurisdiction over the plaintiff's various claims. We make no determination as to the merits of the plaintiff's claims, and we leave to the district court the task of evaluating the defendants' various alternate grounds for dismissal. We have considered all of the plaintiff's other arguments in favor of exercising subject matter jurisdiction, and we find them to be without merit.
 
 
 
 Notes:
 
 
 [1]
 Although Phifer's complaint does not specifically refer to the Fourth Amendment, the complaint can be read to assert a Fourth Amendment claim and the plaintiff has made clear on appeal her intention to pursue such a claim
 
 
 [2]
 The defendants stated at oral argument that the correct word is "black," not "great."
 
 
 [3]
 The dissent concludes that the family court actually and necessarily decided Phifer's claim that the defendants discriminated against her on the basis of race in the initial decision to remove Amkia when the family court stated that Amkia was "lawfully in the custody of [ACS]" and that Amkia was removed by ACS "in a lawful manner."Post, at 63 (quoting the family court). There is no indication in the record that the family court was presented with or considered Phifer's claim of racial discrimination in the initial decision to remove Amkia. Rather, in our view, the family court's statements merely reflect a finding that ACS acted properly in removing Amkia from her mother's custody and that it was in Amkia's best interest to remain in ACS custody given the court's earlier finding that Amkia would be in imminent risk to her life if she were returned to her mother's custody.
 The dissent "do[es] not see how the initial removal could be lawful if it was motivated by racial animus,...." Id. However, as discussed in more detail in the following paragraph, the fact that the family court ultimately credited the allegations of neglect does not preclude a finding that those allegations were initially motivated by racism.
 
 
 [4]
 However, Phifer may not avoid dismissal under theRooker-Feldman doctrine by arguing that her equal protection claim is a general challenge to the constitutionality of an allegedly unconstitutional ACS policy as the relief Phifer requests in her complaint reveals that she is actually only attacking the result in her particular case. See Moccio, 95 F.3d at 200 (looking to the relief requested to determine whether the plaintiff's claim is barred by Rooker-Feldman); People United for Children, 108 F.Supp.2d at 285 (holding that a challenge to the constitutionality of a system-wide policy of resolving an ambiguity in child abuse investigations in favor of finding that abuse had occurred was not barred by Rooker-Feldman as the case did not challenge a finding of neglect or abuse in any particular case). In her complaint, Phifer seeks an order directing ACS to return Amkia to her custody, as well as compensatory and exemplary damages. Phifer does not request declaratory or equitable relief against ACS or the City, or a permanent injunction barring the defendants from continuing to implement the challenged policies and practices. See Moccio, 95 F.3d at 200; People United for Children, 108 F.Supp.2d at 286.
 
 
 [5]
 We assume for purposes of this appeal that state action was involved
 
 
 [6]
 Phifer also argues on appeal that the district court erred when it dismissed her claims for declaratory and injunctive relief against ACS and the medical defendants pursuant to theYounger doctrine in an earlier order entered on September 16, 1999. The only equitable relief Phifer requested in her Complaint was a permanent injunction directing ACS to return Amkia to her custody. Given that Amkia was returned to Phifer's custody in January 2001, the issue of whether the district court erred when it denied the injunctive relief sought by Phifer is moot.
 
 
 
 35
 JACOBS, Circuit Judge, concurring in part and dissenting in part.
 
 
 36
 I concur in the Court's opinion in every respect except one.
 
 
 37
 Tina Phifer has brought a variety of claims arising out of the efforts of the defendant agency and the defendant doctors and social workers to assert custody over her daughter, Amkia, in the hospital and later in foster care, in order to treat the child for a debilitating and life-threatening disease. Phifer alleges (inter alia) that some or all of the defendants prevented her from removing the child from the hospital, and opposed Phifer's custody and parental decisions in family court.
 
 
 38
 I agree with the majority's conclusion that Rooker-Feldman bars Phifer's claim that, while Amkia was in the defendants' custody, their recommendations, representations, or requests to the family court were motivated by racism. See majority op. at 57. The majority nevertheless concludes, however, that Rooker-Feldman is no impediment to Phifer's claim that the initial decision to remove Amkia from Phifer's custody was racially motivated. The majority reasons that the family court "did not, as far as we know, `actually and necessarily decide' the issue of whether the decision to remove Amkia was motivated by racism." (Emphasis added). See majority op. at 58. From this holding, I respectfully dissent.
 
 
 39
 The family court judge, in denying Phifer's second petition for a writ a habeas corpus (seeking custody of Amkia) ruled:
 
 
 40
 There is no doubt whatsoever in this Court's mind that [Amkia] is lawfully in the custody of [ACS].
 
 
 41
 She was removed from the Respondent/Mother by [the ACS] in a lawful manner. And this Court, over the course of three days, conducted a lengthy 1028 hearing to review the continued lawfulness of that custody. And came to the conclusion that [Amkia] would be in imminent risk to her health, indeed, to her life, if she were returned to Respondent/Mother.
 
 
 42
 Joint App. at 112-113 (emphasis added).
 
 
 43
 I do not see how the initial removal could be lawful if it was motivated by racial animus, or how custody could lawfully be prolonged in the hands of parties that seized the child for racist reasons. Having ruled that Amkia was removed from her mother in "a lawful manner," the family court went on to address the continued lawfulness of ACS's custody of Amkia. The majority has allowed Phifer to partition her claims artificially between the course of the agency's custody and all the attendant decisions (which were untainted by racism), and the initial decision to protect the child.
 
 
 44
 Since the family court was presented with Phifer's racism claim prior to determining that the removal was lawful, majority op. at 54, 58, Phifer's claim that the initial removal was racially motivated was "actually and necessarily decided." Phifer has not demonstrated that the family court did not provide a full and fair opportunity to litigate this issue. I therefore conclude that Phifer's claim of racism in the initial removal of Amkia is barred under Rooker-Feldman.