Lisette VELEZ, on behalf of herself and her minor children John Velez and Steven Pagan, Plaintiffs,

v.

Marilyn REYNOLDS, William C. Bell, Nicholas Scoppetta, Child Development Support Corporation, the City of New York, Evelyn Ortiz, and Kathia Brown, Defendants.

No. 02 CIV.8315 JGK.

United States District Court, S.D. New York.

July 10, 2004.

296

Scott A. Bursor, Law Offices of Scott A. Bursor, New York, NY, for Plaintiffs.

Alan R. Meller, Bivona & Cohen, P.C., Stephen Kitzinger, Lisa Grumet, New York, NY, for Defendants.

### OPINION and ORDER

KOELTL, District Judge.

This is a civil rights action brought pursuant to 42 U.S.C. § 1983 and arising out of the prosecution of Lisette Velez ("Velez" or "the plaintiff") for neglect and the removal and retention of her children, John Velez and Stephen Pagan, by the New York City Administration for Children's Services ("ACS"). The plaintiff alleges primarily that ACS removed her children pursuant to an alleged unconstitutional practice and policy of prosecuting battered mothers for neglect solely because they were victims of domestic violence.

The plaintiff, on behalf of herself and her minor children, asserts claims for violations of the Fourth, Ninth, Thirteenth,

Fourteenth, and Nineteenth Amendments against: the City of the New York ("the City"); ACS caseworkers Evelyn Ortiz and Kathia Brown in their individual and official capacities; and ACS Commissioner William C. Bell and former Commissioner Nicholas Scoppetta in their individual and official capacities (collectively, "the City defendants"). In addition, the plaintiff asserts constitutional claims, along with state law claims of intentional infliction of emotional distress and negligence, against the City Development Support Corporation ("CDSC")-an ACS contract agency assigned to the plaintiff's case-and CDSC's employee, social worker Marilyn Reynolds (collectively, the "CDSC defendants").

The City defendants have now moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 dismissing the claims against them on multiple grounds. The City defendants argue that the Court lacks subject matter jurisdiction over the constitutional claims under the *Rooker-Feldman* doctrine, that certain claims are barred by the statute of limitations, and that the plaintiffs cannot show that any City practice, policy, or custom caused the alleged violations. The City asserts qualified immunity with respect to the claims against Ortiz and Brown in their individual capacities, and it argues that that there is no basis for finding that any of the individual City defendants were personally involved in depriving the plaintiffs of any rights. The CDSC defendants similarly move for summary judgment dismissing claims against them.

## I.

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs. Ltd. P' ship*, 22 F.3d 1219, 1223 (2d Cir.1994). "The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo*, 22 F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *see also Gallo*, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994). If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that

there is a genuine issue for trial." Fed. R.Civ.P. 56(e). The nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993); *see also Scotto v. Almenas,* 143 F.3d 105, 114–15 (2d Cir. 1998).

## II.

The following facts are undisputed unless otherwise noted.

On September 17, 1998, pursuant to the New York Family Court Act § 1024, ACS removed the plaintiff's children, John Velez and Steven Pagan, from school after learning that the plaintiff had been assaulted the previous night by Steven Pagan, Sr. ("Pagan"), the father of one of her children. (*See* Am. Compl. ¶ 13, attached as Ex. A to Decl. of Kimberly Conway ("Conway Decl."), dated Oct. 17, 2003; City Defs.' Local Civil Rule 56.1 Statement of Undisputed Facts ("City Defs. 56.1 Stmt.") ¶ 1.) On September 18, 1998, ACS caseworker Evelyn Ortiz filed with the Bronx Family Court petitions for each child alleging neglect by the plaintiff and Pagan. (*See* City Defs. 56.1 Stmt. ¶ 2; Conway Decl. Ex. E (Petitions).)

The petitions explained that ACS had received three reports from a source of "ongoing domestic violence between [the plaintiff and Pagan] that occurs in the presence of the children." (*See* Conway Decl. Ex. E.) The source alleged that the domestic violence was inhibiting John's education and also alleged drug and alcohol abuse by the plaintiff. (*See id.;* City Defs. 56.1 Stmt. ¶ 3.) Although not explicitly stated in the petitions, the reports were that the plaintiff was being abused by Pagan. (*See generally* Pl.'s Local Rule 56.1 Statement of Material Facts ("Pl. 56.1 Stmt.") ¶¶ 1–2, 28, 39–42; Decl. of Scott A.

Bursor ("Bursor Decl."), dated Oct. 30, 2003, Ex. 10 (State Central Registry ("SCR") Summary Report).) Ortiz had been assigned to the case since the first report on November 19, 1997; she had visited Velez's family multiple times and had provided referrals for domestic violence counseling and drug screening. (*See* Pl. 56.1 Stmt. ¶¶ 4, 50–51.)

The same day that the petitions were filed, September 18, 1998, the Bronx Family Court held a preliminary hearing pursuant to Family Court Act § 1027. (*See* City Defs. 56.1 Stmt. ¶ 4. *See generally* Tr. of Sept. 18, 1998 Hearing ("Sept. 1998 Tr."), attached as Bursor Decl. Ex. 14.) The plaintiff was present and represented by counsel, but the plaintiff disputes that she received any legal advice from her court-appointed counsel, Karen Steinberg. (*See id.;* Decl. of Lissette Velez ("Velez Decl."), dated Oct. 20, 2003, ¶¶ 2–3.) Legal Aid counsel represented the children until the court appointed Norton Pinzer as legal guardian for the children. (*See* City Defs. 56.1 Stmt. ¶ 4.) At the conclusion of the hearing, with the plaintiff's consent expressed by her attorney, the court ordered the children removed and remanded to ACS custody pending further proceedings. (*See id.* ¶ 5; Conway Decl. Ex. G (Orders).)

On November 30, 1998, the family court held a fact-finding and dispositional hearing pursuant to Family Court Act § 1047. (*See* City Defs. 56.1 Stmt. ¶ 10; Tr. of Nov. 30, 1998 Hearing ("Nov. 1998 Tr."), attached as Bursor Decl. Ex. 17.) The plaintiff was not present and claims she was not notified of the hearing. (*See* Velez Decl. ¶ 5.) A court-appointed attorney named Sara Somers appeared on the plaintiff's behalf, but the plaintiff claims that she never met with Somers or authorized her representation. (*See id.* ¶ 6.) Somers requested an adjournment so that

her client could be present, but the request was denied, and Somers thereafter did not participate in the proceedings. (*See* Nov. 1998 Tr. at 3–4, 12.) Ortiz was called as the sole witness, and she repeated the allegations of domestic violence in the home, educational neglect, and drug and alcohol abuse. (*See id.* at 4–9.) Ortiz was not cross-examined; Pinzer, appearing on behalf of the children, asked no questions and joined in ACS's application. (*See id.* at 9–10; City Defs. 56.1 Stmt. ¶ 11.) Based on Ortiz's testimony, the court ordered the children removed from the plaintiff's custody and placed with ACS to reside with their respective paternal grandmothers for a period of twelve months; the orders also required the plaintiff and Pagan to complete drug, parental skills, and domestic violence programs. (*See* City Defs. 56.1 Stmt. ¶¶ 13–15; Conway Decl. Ex. J (Orders of fact-finding and disposition).)

After the children's initial removal, ACS made arrangements with CDSC, a foster care agency under contract with ACS, to provide services to the plaintiff. (City Defs. 56.1 Stmt. ¶ 6.) As of December 2000, Marilyn Reynolds was the CDSC social worker assigned to the case. (*See* Am. Compl. ¶ 17; Tr. of Dep. of Marilyn Reynolds ("Reynolds Dep."), dated July 28, 2003, at 17, attached as Bursor Decl. Ex. 8.) Beginning in October 1998, CDSC arranged a plan with the plaintiff whereby she would enroll in a parenting skills program, domestic violence counseling, and a drug rehabilitation program. (*See* City Defs. 56.1 Stmt. ¶ 7; CDSC Mot. Ex. O (service contracts between CDSC and Velez, dated Oct. 15, 1998 and Feb. 15, 2000).)

On November 30, 1999, the family court order remanding the plaintiff's children to ACS custody for twelve months lapsed. (City Defs. 56.1 Stmt. ¶ 17.) The plaintiff claims that she was not notified of this fact, and she did not seek the return of her children at that time. (*See* Velez Decl. ¶ 14; City Defs. 56.1 Stmt. ¶ 18.) Ortiz had no involvement in the case after the dispositional hearing the previous year, and at some point the case was reassigned to ACS caseworker Kathia Brown, who began working at ACS in January 2000. (City Defs. 56.1 Stmt. ¶¶ 16, 19.) Shortly before August 2000, Brown learned that the placements had lapsed, and on August 2, 2000 she filed neglect petitions in the Bronx Family Court to extend the children's placement. (*See id.* ¶ 21; Pl. 56.1 Stmt. ¶¶ 153–54; Conway Decl. Ex. K (Petitions).) The petitions included a "rider" reciting the prior finding of neglect against the plaintiff and asserting that the plaintiff had not complied with the required service programs. (*See* Conway Decl. Ex. K; City Defs. 56.1 Stmt. ¶ 22.) The plaintiff disputes the bases for the petitions and notes that Brown never spoke with Velez, her children, or Ortiz before filing the petitions. (*See* Pl. 56.1 Stmt. ¶¶ 155–62, 209–10; Tr. of Dep. of Kathia Brown ("Brown Dep."), dated July 24, 2003, at 53–71, attached as Bursor Decl. Ex. 6.)

From September 2000 through February 2001, the Bronx Family Court held hearings in which a decision on the extension of placement was adjourned and the neglect petitions were converted into petitions for an extension of placement. (*See* City Defs. 56.1 Stmt. ¶¶ 24–26.) During those hearings, the plaintiff was present and represented by a court-appointed attorney, Robert A. Leder, but the plaintiff denies that she had meaningful contact with Leder. (*See id.*; Velez Decl. ¶¶ 11–12.) On April 4, 2001, pursuant to Family Court Act § 1055, the family court held an extension of placement and permanency hearing, at which the plaintiff and Leder were present. (*See* City Defs. 56.1 Stmt. ¶ 27.) According to the plaintiff, the hearing lasted less than five minutes and no witnesses were examined. (*See* Velez

Decl. ¶ 13.)[1] The court issued orders extending the children's placement for an additional twelve months "on consent," although the plaintiff denies giving consent or authorizing her counsel to do so. (*See* Conway Decl. Ex. L (Orders); Velez Decl. ¶ 15.) The orders provided further for the trial discharge of the children to the plaintiff after she completed domestic violence and drug counseling programs, and they instructed ACS to file a petition for the next permanency hearing no later than sixty days before April 4, 2002. (*See* City Defs. 56.1 Stmt. ¶ 30; Conway Decl. Ex. L (Orders).)

After that hearing the plaintiff continued to work toward completing the programs so that she could be reunited with her children. On December 5, 2001, ACS filed petitions for an extension of placement and permanency hearing indicating that the permanency plan was to return the children to their mother but that an extension was needed for the mother to find adequate housing. (*See* City Defs. 56.1 Stmt. ¶ 31; Conway Decl. Ex. M (Petition at 2, 9, 12).) Around January 2002, the plaintiff secured housing, and on February 28, 2002, ACS held a conference that led to

the children being discharged to the plaintiff's custody on a trial basis in March 2002. (*See* City Defs. 56.1 Stmt. ¶¶ 32–33; Bursor Decl. Ex. 24 (CDSC Progress Note Narrative, dated Jan. 18, 2002, indicating that Velez had completed her goals and obtained housing).) On June 25, 2002, ACS held a final discharge conference, after which the plaintiff regained full and unrestricted custody of her children. (*See* City Defs. 56.1 Stmt. ¶ 34; Pl. 56.1 Stmt. ¶ 200.) The original complaint in this action was filed on October 18, 2002. (City Defs. 56.1 Stmt. ¶ 35.)

### III.

The plaintiff has brought this action pursuant to 42 U.S.C. § 1983, alleging that the removal of her children and subsequent actions by ACS and CDSC violated her and her children's constitutional rights. In particular, the plaintiff claims that ACS removed her children pursuant to an alleged policy of prosecuting abused mothers for neglect solely because they were victims of domestic violence. (Am. Compl.¶ 1.) This alleged policy, the plaintiff asserts, was recently recognized and found unconstitutional in *In re Nicholson*, 181 F.Supp.2d 182 (E.D.N.Y.2002), and *Nicholson v. Williams*, 203 F.Supp.2d 153 (E.D.N.Y.2002) (collectively, "*Nicholson*").[2] (Am.Compl.¶ 1.)

1. A transcript of that hearing has not been produced for the record for these motions.

2. *Nicholson* is a class action brought on behalf of battered women and their children who had been removed by ACS. *In re Nicholson*, 181 F.Supp.2d at 183. The district court held that ACS policies toward domestic-violence victims violated Fourteenth Amendment rights to substantive and procedural due process, and the court issued a preliminary injunction directed at those policies. *See id.* at 184–86. The court later issued a supplemental opinion expanding on the legal and factual bases for the injunction. *See Nicholson*, 203 F.Supp.2d 153. The injunction was recently extended by *Nicholson v. Williams*, 00 Civ. 2229 JBW, 2004 WL 1304055 (E.D.N.Y. June 14, 2004).
 An appeal of the preliminary injunction followed in *Nicholson v. Scoppetta*, 344 F.3d 154

(2d Cir.2003). Rather than deciding the constitutional issues, the Court of Appeals invoked *Pullman* abstention and certified questions to the New York Court of Appeals on the grounds that interpretations of state law—namely, definitions and standards in the Family Court Act-could obviate or modify the serious constitutional questions presented. *See id.* at 158, 167–68, 176–77; *cf. R.R. Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The New York Court of Appeals has accepted and is now considering the certified questions. *Nicholson v. Scoppetta*, 1 N.Y.3d 538, 775 N.Y.S.2d 233, 807 N.E.2d 283 (2003).

The parties in this case have not argued for *Pullman* abstention and have not suggested that the procedural posture of *Nicholson* affects these motions.

The Amended Complaint now contains three counts. Count I names all defendants and states § 1983 claims for the violation of rights under the Fourth, Ninth, Thirteenth, Fourteenth, and Nineteenth Amendments. (Am.Compl.¶¶ 28–31); *see Feingold v. New York*, 366 F.3d 138, 159 (2d Cir.2004) ("To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." (internal quotation omitted)). Counts II and III are state law claims against the CDSC defendants for intentional infliction of emotional distress and negligence, respectively. (Am. Compl.¶¶ 32–43.)

 With respect to the constitutional claims generally, parents "have a constitutionally protected liberty interest in the care, custody and management of their children," and family members have a fundamental right under the Fourteenth Amendment to remain together. *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir.1999); *see also Nicholson*, 203 F.Supp.2d at 233–37. Thus, while "the State has a profound interest in the welfare of the child," interference with family integrity must comport with procedural and substantive due process, as well as rights under the Equal Protection Clause and Fourth Amendment, among other provisions. *Tenenbaum*, 193 F.3d at 593–94; *see also Phifer v. City of New York*, 289 F.3d 49, 57–62 (2d Cir.2002); *Kia P. v. McIntyre*, 235 F.3d 749, 757–63 (2d Cir. 2000); *Nicholson*, 203 F.Supp.2d at 236–49; *People United for Children v. City of*

*New York*, 108 F.Supp.2d 275, 292–300 (S.D.N.Y.2000). Procedural due process generally requires a hearing prior to depriving a parent of custody or a prompt post-deprivation hearing if the child is removed under emergency circumstances. *See, e.g., Kia P.*, 235 F.3d at 760 & n. 4; *Tenenbaum*, 193 F.3d at 593. Substantive due process protects individuals from arbitrary government intrusions by requiring a reasonable basis or justification for such actions. *See, e.g., Kia P.*, 235 F.3d at 758–59; *People United for Children*, 108 F.Supp.2d at 292–93.

Specifically, the plaintiff presents constitutional claims in connection with four events or actions by ACS: [3]

First, the plaintiff asserts that the initial seizure of her children on September 17, 1998 without prior judicial authorization violated her and her children's procedural due process rights and violated her children's Fourth Amendment rights. The Court of Appeals in *Tenenbaum* found that the seizure of a child without prior court authorization is permitted only in "exigent circumstances" where the danger to the child's health or safety is so imminent that there is not sufficient time to seek judicial authorization. *See Tenenbaum*, 193 F.3d at 604–05 (discussing child's Fourth Amendment rights and equating analysis to inquiry for procedural due process); *id.* at 594–95 (discussing procedural due process rights of child and parents); *see also Gottlieb v. County of Orange*, 84 F.3d 511, 520 (2d Cir.1996) (stating that child may be removed without hearing "where there is an objectively reasonable basis for believing that a threat to the child's health or

**3.** The following description of the constitutional claims is based on the Plaintiff's Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment. The motions do not, for the most part, challenge the substance of the individual constitutional claims and have not required the plaintiff to

articulate the precise legal and factual bases for each violation alleged. This Opinion and Order thus discusses the constitutional claims and corresponding legal standards only to the extent necessary for the current motions, particularly with respect to the *Rooker–Feldman* analysis.

safety is imminent"). These claims thus depend on whether the initial seizure without a court order was justified by such an exigency.

Second, the plaintiff alleges that ACS filed neglect charges against her and removed her children solely because she was a victim of domestic violence. Citing *Nicholson*, the plaintiff contends that ACS subjected her to a policy that "treats [abused mothers] unequally from other parents who are not abused" and violated her and her children's rights to equal protection under the Fourth, Ninth, Thirteenth, and Nineteenth Amendments. *Nicholson*, 203 F.Supp.2d at 248. The plaintiff also alleges that ACS filed the petitions because of a bias toward unnecessary removals. *Cf. People United for Children*, 108 F.Supp.2d at 280, 292–300 (involving claims that ACS policy of resolving ambiguities in favor of removal violated First, Fourth, Ninth, Thirteenth, and Fourteenth Amendment-substantive and procedural due process and equal protection). With respect to the initial prosecution, the plaintiff also claims that Ortiz violated the plaintiff's due process rights by making allegedly false statements in neglect petitions and at the November 30, 1998 hearing. In particular, the plaintiff claims that Ortiz repeated allegations about alcohol and drug use by the plaintiff that Ortiz allegedly knew were false.

Third, the plaintiff asserts claims arising out of ACS's retention of the children from November 30, 1999 through April 4, 2001 after the initial twelve-month placement had lapsed. The plaintiff argues that ACS and CDSC, by retaining her children without legal authority or a reasonable basis, violated her children's Fourth Amendment rights and her and her children's substantive due process rights. The plaintiff also asserts procedural due process claims based on the alleged failure to provide a prompt hearing after the placement lapsed.

Fourth, the plaintiff claims that ACS reapplied policies that are allegedly biased against abused mothers and in favor of unnecessary removals when, on August 2, 2000, caseworker Brown filed additional neglect petitions that led to the April 4, 2001 extension of placement by the family court. The plaintiff also alleges that Brown filed the petitions without conducting any investigation and that the petitions included false allegations.

The plaintiff alleges that all of the violations occurred under color of state law and were caused by ACS policies and customs established and/or ratified by Commissioner Bell and former Commissioner Scoppetta. (*See* Am. Compl. ¶ 30.) The plaintiff further claims that CDSC, as the contract agency assigned to the case, participated in violating the plaintiffs' rights. (*See id.*)

To show the existence of the alleged policies or customs and in opposition to the current motions, the plaintiff has introduced numerous exhibits, as well as submissions from two experts. Phillip C. Segal was a judge of the New York State Family Court sitting in New York City from 1991 to 2001. (*See* Expert Report of Phillip C. Segal, Esq. ("Segal Report") ¶ 1, attached at Bursor Decl. Ex. 5.) Judge Segal, who also testified as an expert in *Nicholson*, submitted an expert report and a declaration concluding that ACS prosecuted the plaintiff pursuant to policy that discriminated against abused mothers and that the plaintiffs did not have a full and fair opportunity to litigate in family court. (*See generally* Segal Report; Decl. of Phillip C. Segal, Esq. ("Segal Decl."), dated Oct. 23, 2003). Kurt Mundorff was an ACS "Child Protective Specialist II" from May 2000 to August 2001 and graduated from ACS's training program. (Decl. of Kurt Mundorff ("Mundorff Decl."), dated

Oct. 20, 2003, ¶ 1.) Mundorff addresses alleged problems in ACS policies, including a bias toward unnecessary removals, the inadequacies of service programs that parents are required to complete to regain custody of their children, and the tendency for ACS to retain children without legal authority after court-ordered placements have lapsed. (*See generally* Mundorff Decl.)

## IV.

■ The City defendants argue that the claims against them must be dismissed pursuant to the *Rooker-Feldman* doctrine. *See Dist. of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923). Under the *Rooker-Feldman* doctrine, a federal court has no subject matter jurisdiction over a case that seeks to reverse or modify a state court decision, or a case in which the federal claims are "inextricably intertwined" with the merits of the state court's judgment. *See Phifer,* 289 F.3d at 55–56; *Moccio v. N.Y. State Office of Court Admin.,* 95 F.3d 195, 198 (2d Cir.1996); *Harp v. City of New York,* 218 F.Supp.2d 495, 498 (S.D.N.Y.2002). In this case, the plaintiff has regained full custody of her children and is not seeking to reverse or modify a state court decision. The issue is whether her claims are "inextricably intertwined" with Bronx Family Court proceedings.

■ The Court of Appeals for the Second Circuit has interpreted the term "inextricably intertwined" to be coextensive with the law of preclusion, and subsequent federal litigation is thus barred under the *Rooker-Feldman* doctrine if it would be barred under the principles of res judicata or collateral estoppel. *See Phifer,* 289 F.3d at 56; *Moccio,* 95 F.3d at 199–200; *Harp,* 218 F.Supp.2d at 498. Because res judicata does not apply to a § 1983 claim for damages where the previous litigation did not involve damages, the question is whether the plaintiff's claims are barred by collateral estoppel. *See Phifer,* 289 F.3d at 56.

■ Under New York law, collateral estoppel or issue preclusion bars claims where "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Colon v. Coughlin,* 58 F.3d 865, 869 (2d Cir.1995); *see also Phifer,* 289 F.3d at 56; *Moccio,* 95 F.3d at 200. The defendants, as the parties asserting issue preclusion, bear the burden of showing that the issues were previously decided by the Bronx Family Court, while the plaintiff has the burden of showing the absence of a full and fair opportunity to litigate. *Colon,* 58 F.3d at 869.

## A.

■ Issue preclusion will apply only if it is "quite clear" that the requirements are satisfied. *Colon,* 58 F.3d at 869. Thus, under the first part of the collateral estoppel inquiry, the defendants must show that it is "quite clear" that the identical issue was "actually and necessarily decided." *Id.* When a plaintiff challenges the constitutionality of official conduct after a state family court has already decided issues of removal and neglect, the court must engage in "a careful analysis of the basis for the individual claims in light of the information presented to the family court and the family court's ultimate factual findings and legal conclusions." *Park v. City of New York,* No. 99 Civ. 2981 (LBS), 2003 WL 133232, at *10 (S.D.N.Y. Jan.16, 2003) (following example of *Phifer,* 289 F.3d at 57–62). In *Park,* for example, the court held that the *Rooker-Feldman* doctrine barred substantive due process claims challenging the reasonableness of

the family court's decisions to remove the children and place them with a non-kinship foster home, and a Fourth Amendment claim arising out of a search of the plaintiffs' apartment was also barred. *See id.* at *10–*11 & n. 10. *Park,* however, held that the family court did not address, and that the *Rooker-Feldman* doctrine thus did not preclude, procedural due process claims arising out of the initial removal of the children or equal protection claims alleging discriminatory motives underlying the removal and placement decisions. *See id.*

■ In this case, with respect to the initial seizure of the plaintiff's children without prior court authorization, the procedural due process and Fourth Amendment claims depend on whether "exigent" or "emergency" circumstances justified ACS's actions. *See Tenenbaum,* 193 F.3d at 594–95, 604–05. While the family court did not specifically determine the legality of the seizure, the City defendants argue that the court effectively addressed the issue in its September 18, 1998 orders, each of which included a line that the "removal is necessary because of imminent risk." (Conway Decl. Ex. G (Orders at 2).) At the preliminary hearing, however, as the plaintiff argues, there was no argument that the children were in imminent danger when seized at school the prior day, and the family court declared that the children were being temporarily removed "[o]n consent" based on a lack of objections from counsel. (*See* Sept. 1998 Tr. at 4.) Thus the basis for the seizure itself was not at issue or necessarily decided during the hearing, and neither at the hearing nor in the orders did the family court make findings about the nature or severity of the risk to the children.

Moreover, *Tenenbaum* held that an "'emergency' removal" would be warranted only if ACS did not have sufficient time, consistent with the child's safety, to obtain prior court authorization. *See Tenenbaum,* 193 F.3d at 596; *see also id.* at 594–95, 605. The general statement that an "imminent risk" justified continuing the children's removal cannot constitute a specific finding that caseworkers lacked reasonably sufficient time to obtain a court order prior to seizing the children from school.[4] The focus of the family court petitions and hearing was on whether there was a basis for the removal of the children, not on whether there was a basis to seize the children prior to a hearing. The reports about the potential neglect of the children had existed for some time, and there is no indication that the family court petitions or hearing concerned whether there were exigent circumstances requiring the seizure of the children from school prior to having a court hearing. Indeed, the continued removal of the children was resolved "on consent." (*See* Sept. 1998 Tr. at 4.) Questions as to the constitutionality of the initial seizure thus were not actually decided by the family court and are not barred by the *Rooker-Feldman* doctrine.[5]

---

**4.** A finding that "removal is necessary to avoid imminent risk to the child's life or health" is the statutory basis for a preliminary order removing or continuing the removal of a child. N.Y. Fam. Ct. Act § 1027(b)(i). The focus is on the child's interests pending a final disposition, not on the legality of the seizure itself. *See* N.Y. Fam. Ct. Act § 1027(a), (b)(i).

**5.** The ruling in *Phifer* that the family court "in essence" decided the Fourth Amendment is-

sue is distinguishable. *See Phifer,* 289 F.3d at 61. In that case, the child was hospitalized for a life-threatening illness and was "seized" when members of the hospital staff refused to allow the mother to remove her daughter from care. *See id.* at 60–61. Thus the justification for the immediate seizure was identical to the basis for the family court finding neglect: that the mother was causing imminent danger to the child by interfering with her medical treatment. *See id.* at 61.

In contrast, the claims that Ortiz provided false testimony to the family court would be inextricably intertwined with that court's judgment if there was a full and fair opportunity to litigate in those proceedings. At the November 30, 1998 hearing, the family court specifically found Ortiz's testimony credible and adopted it as the basis for finding neglect by the plaintiff. (*See* Nov. 1998 Tr. at 10.) An attack on Ortiz's testimony would thus attack the merits of the family court's decision. *See Storck v. Suffolk County Dep't of Social Servs.*, 62 F.Supp.2d 927, 938 (E.D.N.Y.1999) (barring claims that doctors' testimony was false because those claims would, if proven, "lead to the inescapable conclusion that the family court ruling was 'wrong'"); *cf. Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 25, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) (Marshall, J., concurring) ("[A] federal claim is inextricably intertwined with the state-court judgment if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it.").

The application of the *Rooker-Feldman* doctrine is most complicated for the claims that ACS prosecuted the plaintiff solely because she was a victim of domestic violence. At the fact-finding and dispositional hearing on November 30, 1998, the current arguments about ACS's policies toward abused mothers were not presented, but the family court generally found that

> credible testimony presented today established beyond the statutory required burden of proof the neglect of the Respondent Mother and Father based upon the domestic violence engaged in by both the mother and the father in the presence of both of the children[, the] educational neglect of the child, John, especially regarding his excessive absences, [and] alcohol abuse by the Re-

spondent Mother and drug abuse by the Respondent Mother and Father . . . .

(Nov.1998 Tr. at 10–11.) The City defendants thus argue that the family court's finding of neglect precludes claims that the prosecution of the plaintiff was unjustified.

Under the *Rooker-Feldman* doctrine, where there was a full and fair opportunity to litigate in family court, a federal court generally will not have jurisdiction over substantive due process challenges to the reasonableness of particular ACS actions; but the court may be able to entertain equal protection claims based on a discriminatory motive. *See, e.g., Phifer*, 289 F.3d at 58–62; *Park*, 2003 WL 133232, at *10–*11; *see also Baca v. City of New York*, No. 00 Civ. 4508 (CBM), 2003 WL 21638211, at *5–*6 (S.D.N.Y. July 11, 2003) (precluding claim that ACS recommendations adopted by family court lacked support, but allowing equal protection claims based on sexual-orientation discrimination). As explained in *Phifer*, a substantive due process challenge to a particular ACS removal, for example, turns on whether there was a "reasonable basis" for ACS's actions; thus the "claim could only succeed to the extent that the state court wrongly decided the issue" of whether the removal was justified. *See Phifer*, 289 F.3d at 60; *see also Park*, 2003 133232, at *10; *Murray v. Admin. for Children's Servs.*, No. 98 Civ. 7356 (JSR), 1999 WL 33869, at *2 (S.D.N.Y. Jan. 25, 1999) (barring claims that initial removal and placement of child were without cause). Equal protection claims, in contrast, are not necessarily barred because, as *Phifer* explained, family court adjudications do not generally involve inquiries into the motives of the parties bringing the charge. *See Phifer*, 289 F.3d at 59 (concluding that, logically, finding of neglect did not exclude possi-

bility that racism motivated initial decision to remove child);[6] *cf. Harp,* 218 F.Supp.2d at 500 (finding discrimination claim not barred by state court's rejection of Article 78 petition; racism could have motivated termination even if state court found that substantial evidence supported allegations of misconduct).

In this case, the precise legal and factual bases for the plaintiff's claims have not yet been fully articulated. The plaintiff is arguing, to an extent, that ACS was not justified in prosecuting her and removing her children solely because she was a victim of domestic violence. Those issues were decided by the family court, and they reflect a particular application of the substantive due process violations found in *Nicholson.*[7] *See Nicholson,* 203 F.Supp.2d at 250–53 (holding that ACS violated substantive due process by prosecuting abused mothers and unnecessarily removing their children without particularized evidence of harm). The plaintiff, however, also asserts that ACS's practice "treats [abused mothers] unequally from other parents who are not abused" and violates equal protection rights under the Fourth, Ninth, Thirteenth, Fourteenth, and Nineteenth Amendments. *Nicholson,* 203 F.Supp.2d at 248; *cf. People United for Children,* 108 F.Supp.2d at 295–97 (denying motion to dismiss equal protection claims asserting that policy of resolving ambiguities in favor of removal discriminated against African–American parents). Such claims potentially involve ACS's motives for initiating the prosecution of the plaintiff and would not necessarily be adjudicated in family court. *See Phifer,* 289 F.3d at 59.[8] The defendants bear the burden of proving the first prong of the collateral estoppel inquiry, and without further articulation of the claims, it is not "quite clear" that the family court actually decided the underlying issues. *See Colon,* 58 F.3d at 869.

■■■ Finally, the defendants cannot show that the first prong of the collateral estoppel inquiry is satisfied for the claims arising after the 1998 proceedings. The plaintiff contends that ACS illegally retained her children after their placement lapsed on November 30, 1999, and it appears that this issue was not raised in the family court hearings in September 2000 through April 2001. (*See* Velez Decl. ¶ 14.) In addition, the precise bases for the fami-

---

6. In *Phifer,* the *Rooker-Feldman* doctrine barred certain race discrimination claims arising out of representations made during family court proceedings. *See id.* at 57–58. But the claims were barred only because those same discrimination allegations were raised during the family court proceedings and were explicitly rejected by the judge. *See id.* Closely related claims of discrimination in the initial decision to remove the child were permitted because the precise issue was not actually and necessarily decided by the family court. *See id.* at 58.

7. Because the plaintiff is only seeking damages based on her particular case and is not seeking declaratory or injunctive relief, she cannot avoid the *Rooker-Feldman* doctrine by arguing that she is generally challenging the legality of a system-wide ACS policy. *See Phifer,* 289 F.3d at 59 n. 4; *Moccio,* 95 F.3d

at 200 (citing *Feldman,* 460 U.S. at 486, 103 S.Ct. 1303, and explaining that courts look to relief requested to determine whether plaintiff has stated "general claims"); *cf. People United for Children,* 108 F.Supp.2d at 285–86 (finding that *Rooker-Feldman* doctrine did not apply because plaintiffs were challenging ACS policy, not validity of particular family court decisions, and were seeking declaratory and injunctive relief as well as monetary damages).

8. Similarly, the family court's findings of educational neglect and drug/alcohol use do not preclude a claim that domestic violence was the sole reason for ACS initiating the prosecution against the plaintiff. (*See* Segal Report ¶ 12 (finding it "unlikely that ACS would have prosecuted Ms. Velez for neglect" based only on alleged educational neglect and drug and alcohol use).)

ly court's April 4, 2001 orders extending the children's placement are unclear. The defendants have not provided a transcript of the April 4, 2001 hearing, and the April 4, 2001 orders indicate that the placement was extended "on consent." (*See* Conway Decl. Ex. L (Orders at 3.))[9] Because Brown's August 2, 2000 neglect petitions were converted into extension of placement petitions (*see* City Def. 56.1 Stmt. ¶¶ 25, 28), it is unclear that the allegedly false statements in the original petitions were addressed by the family court.

In sum, the first prong of the *Rooker-Feldman*/collateral estoppel inquiry is not satisfied for the procedural due process and Fourth Amendment claims with respect to the initial seizure; it is satisfied for the claims involving Ortiz's allegedly false testimony. In addition, the defendants have not met their burden for the claims based on the initial 1998 prosecution and for the claims arising after 1998.

### B.

 In any event, for the *Rooker-Feldman* doctrine to preclude jurisdiction over any of the claims, the plaintiffs must have had a full and fair opportunity to litigate the respective issues in the state court proceedings. *See, e.g., Richards v. City of New York*, No. 97 Civ. 7990 (MBM), 2003 WL 21036365, at *8 (S.D.N.Y. May 7, 2003) (finding that claims were actually and necessarily decided by family court but that *Rooker-Feldman* did not control because there was not a full and fair opportunity to litigate issues). In determining whether a party has had a full and fair opportunity to litigate in prior state proceedings, courts must consider "the realities of the prior litigation," including whether there were any circum-

stances that "may have had the practical effect of discouraging or deterring a party from fully litigating the determination." *Ryan v. N.Y. Tele. Co.*, 62 N.Y.2d 494, 478 N.Y.S.2d 823, 467 N.E.2d 487, 491 (1984) (internal quotations and alterations omitted). Among the factors to be considered are "the nature of the forum and the importance of the claim in the prior litigation, the incentive and initiative to litigate and the actual extent of litigation, the competence and expertise of counsel, the availability of new evidence, the differences in the applicable law and the foreseeability of future litigation." *Id., quoted by Richards*, 2003 WL 21036365, at *12. The burden is on the plaintiff to establish this second prong of the collateral estoppel inquiry. *See Ryan*, 478 N.Y.S.2d 823, 467 N.E.2d at 491.

 In this case, evidence in the record establishes that the plaintiff and her children did not have a full and fair opportunity to litigate in family court. The City defendants argue that the plaintiffs had court-appointed counsel and the opportunity to challenge ACS allegations both in the proceedings that actually occurred and through Family Court Act procedures, which include the right to appeal. The realities of the prior litigation, however, are that the family court proceedings involved only a cursory evaluation of the charges, and the plaintiffs had no real opportunity to challenge ACS allegations or exploit Family Court Act procedures because they were not adequately represented by their court-appointed attorneys.

To establish the ineffectiveness of counsel, the plaintiff has submitted a declaration stating that she had almost no contact with the various attorneys assigned to her

---

9. For the reasons explained with respect to the initial prosecution, even if the bases for the April 4, 2001 family court decision were clear, it is unlikely that the decision would

bar equal protections claims based on Brown's decision to file the neglect petitions in August 2000.

and that she was not advised about her legal rights by her counsel or the family court. (*See* Velez Decl. ¶¶ 2–4, 6, 11–12.) While the plaintiff's counsel may have consented to several actions by ACS and the family court, the plaintiff denies giving consent or being able to give informed consent to ACS actions during the proceedings. (*See, e.g.,* Velez Decl. ¶¶ 10, 16–18.) Separate legal counsel was assigned to represent the children, but their declarations state that they did not meet or speak with their attorney either. (*See* Decl. of John Velez ("J. Velez Decl."), dated Oct. 19, 2003, ¶¶ 3, 5; Decl. of Steven Pagan, dated Oct. 19, 2003, ¶¶ 2, 4.) The transcripts of the proceedings indicate that the plaintiffs' attorneys failed to take any action "or make any argument whatsoever" on behalf of the plaintiffs' interest in remaining together. (Segal Decl. ¶ 50, *see also id.* ¶¶ 50–51, 62–63; *See generally* Sept. 1998 Tr.; Nov.1998 Tr.)

In particular, the November 30, 1998 fact-finding hearing did not provide a full and fair opportunity to litigate. The plaintiff was not present because, she maintains, she was not notified of the hearing date. (*See* Velez Decl. ¶ 5).[10] The plaintiff's court-appointed counsel, Ms. Somers, who was not the same counsel as in prior proceedings, had never met or spoken with the plaintiff. (*See id.* ¶ 6.) Ms. Somers requested an adjournment to allow the plaintiff to be present, but that request was denied, and counsel then declared for the record that she would not be participating in the proceedings. (*See* Nov. 1998 Tr. at 3–4, 12.) Ortiz, the only witness to testify, was subject to a brief examination by the City's counsel and was not cross-

examined. (*See id.* at 4–9.) With no conflicting evidence presented, the family court adopted Ortiz's testimony and the City's proposed findings wholesale. (*See id.* at 10–11.)

The fact that Velez's counsel affirmatively stated that she would not participate after her request for a continuance was denied and the fact that Ortiz was not cross-examined demonstrate the absence of an opportunity to litigate issues concerning Ortiz's alleged false testimony and the basis for the neglect prosecution in general. For example, Ortiz repeated allegations made by one source as to the plaintiff's alleged drug and alcohol abuse—including that Velez was a "crackhead"—but those allegations had been deemed "unsubstantiated" in ACS reports. (*See* Nov. 1998 Tr. at 6–7; Bursor Decl. Ex. 10, at G939 (SCR Summary Report bearing Bates Stamp page numbers); *see also* Ortiz Dep. at 35, 43–44, 51–52, 58, 61–64, 89 (indicating that in multiple visits with plaintiff, Ortiz never found plaintiff to be under influence of drugs or alcohol).) Ortiz also testified that John Velez had told her that his mother used marijuana and drank alcohol and that the plaintiff admitted to smoking marijuana. (*See* Nov. 30, 1998 Tr. at 8–9.) The plaintiff and her son deny making those statements to Ortiz and maintain that Ortiz's testimony is unsupported by contemporaneous ACS reports and contradicted by testimony Ortiz later gave in her deposition for this case. (*See* Velez Decl. ¶ 7; J. Velez Decl. ¶ 2; Pl. 56.1 Stmt. ¶¶ 135–36 (citing SCR Summary Report and Ortiz Dep.).) In addition, cross-examination and evidence, had discovery

---

10. The City defendants argue that the plaintiff had notice of the November 30, 1998 hearing because the plaintiff was present when that date was set during a October 16, 1998 proceeding. (*See* Bursor Decl. Ex. 16, at 3–4 (Tr. of Oct. 16, 1998 Hearing).) The transcript of the October hearing reveals that the family court did not explain to the plaintiff the significance of the November 30 date being set. (*See id.*) It is easy to credit the plaintiff's statements that she did not understand that a final hearing date had been set and was unaware that she needed to appear. (*See* Velez Decl. ¶¶ 4–5.)

been sought, could have been used to show that Velez was not a danger to her children's health and safety. (*See, e.g.,* Pl. 56.1 Stmt. ¶¶ 77–81, 85 (citing to Ortiz Dep. and exhibits).) None of these issues, however, were raised before the family court.

Judge Segal, based on his experience in the family court system and a review of records in Velez's case, has submitted a declaration concluding that "neither Ms. Velez nor the children had a full and fair opportunity to litigate in the Bronx Family Court because their counsel were ineffective, and because of other shortcomings in the proceedings." (Segal Decl. ¶ 3.) Judge Segal's declaration, which contains citations to the decision in *Nicholson* and a March 9, 2000 report by the Special Child Welfare Advisory Panel, outlines serious structural flaws in the way ACS and the family court system adjudicate neglect and abuse cases. (*See* Segal Decl. ¶¶ 4–14 & Ex. A); *see also Nicholson,* 203 F.Supp.2d at 221–28, 253–56 (discussing problems in judicial oversight of ACS removals, particularly involving lack of effective representation). In examining the proceedings on the Ortiz and Brown petitions, Judge Segal identified multiple deficiencies in the representation of the plaintiffs, as well as shortcomings in the proceedings. (*See, e.g.,* Segal Decl. ¶¶ 50–51, 62–63.) For example, at the September 18, 1998 hearing, the family court failed to comply with statutory procedures required to notify the plaintiff of her rights. (*See id.* ¶¶ 19–20.) The City defendants have not even attempted to rebut the substance of Segal's conclusions.

In sum, under the circumstances, the plaintiffs did not have a full and fair opportunity to litigate issues in any of the family court proceedings, and the *Rooker-Feldman* doctrine cannot preclude jurisdiction over any of the claims.

## V.

The City defendants next contend that certain claims should be dismissed as time barred. For claims brought pursuant to 42 U.S.C. § 1983, federal law determines when the cause of action accrues, but state law determines the length of the limitations period, and the statute of limitations for § 1983 actions arising in New York is three years. *See Pearl v. City of Long Beach,* 296 F.3d 76, 79–80 (2d Cir.2002); *Eagleston v. Guido,* 41 F.3d 865, 871 (2d Cir.1994); *see also* N.Y. C.P.L.R. § 214(5). The statute of limitations begins to run "when the plaintiff knows or has reason to know of the injury" that is the basis for the action. *Pearl,* 296 F.3d at 80 (internal quotations omitted). The plaintiff filed her Complaint on behalf of herself and her minor children on October 18, 2002, and thus the claims generally must have accrued on or after October 19, 1999.

Several of the claims are plainly not time barred. The claims on behalf of the children are timely pursuant to N.Y. C.P.L.R. § 208, which tolls the normal statute of limitations during infancy. The plaintiff has also asserted claims arising out of the retention of her children after the initial custody order lapsed on November 30, 1999, and arising out of caseworker Brown's filing of the August 2, 2000 neglect petitions.

The dispute is over the plaintiff's claims on her own behalf arising out of ACS's seizure of the children and prosecution of the plaintiff in fall 1998. The plaintiff admits that she knew or had reason to know of the violations when they occurred. She contends, however, that the 1998 removal and prosecution were part of a "continuing violation" caused by unconstitutional ACS policies and extending through 2001 with the retention of the plaintiff's children and ACS's filing of essentially

identical neglect charges to extend their placement.

■■■■■ The continuing violation doctrine generally provides that where there is a discriminatory practice or policy, the accrual time for the statute of limitations may be delayed until the last act in furtherance of the policy. *See Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999). To invoke the doctrine, a plaintiff must demonstrate either (1) a specific ongoing discriminatory policy or practice, or (2) specific and related instances of discrimination that are permitted to continue unremedied for so long as to amount to a discriminatory policy or practice. *See Bendik v. Credit Suisse Fist Boston (USA), Inc.*, No. 02 Civ. 9554 (CBM), 2004 WL 736852, at *6 (S.D.N.Y. Apr.5, 2004); *Branch v. Guilderland Cent. Sch.*, 239 F.Supp.2d 242, 253 (N.D.N.Y.2003). If the plaintiff can sufficiently allege "the existence of an ongoing policy of discrimination and some non-time-barred acts taken in furtherance of that policy," acts outside of the limitations period may be considered as part of the timely claim. *Bendik*, 2004 WL 736852, at *6.

■■■■■ In 2002, the Supreme Court in *National Railroad Passenger Corp. v. Morgan* eliminated the continuing violation doctrine for Title VII claims involving discrete discriminatory acts, as opposed to claims alleging a hostile work environment. *See Morgan*, 536 U.S. 101, 109–16, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). The principle in *Morgan* has been applied to § 1983 employment discrimination claims. *See, e.g., Carmellino v. Dist. 20 of the New York City Dep't of Educ.*, No. 03 Civ. 5942 (PKC), 2004 WL 736988, at *12–*13 (S.D.N.Y. Apr.6, 2004). The decision in *Morgan*, however, was based on the particular language in Title VII, 42 U.S.C. § 2000e–5(e)(1), *see Morgan*, 536 U.S. at 109–15, 122 S.Ct. 2061, and the Court expressly did not "consider the timely filing

question with respect to 'pattern-or-practice' claims," *id.* at 115 n. 9. Thus the continuing violation doctrine may be available for § 1983 claims based on, for example, an ongoing municipal policy or custom. *See Branch*, 239 F.Supp.2d at 253–54 (discussing *Morgan* and finding retaliation claims timely where complaint alleged "a 'policy' or 'custom'" and thus provided "a permissible and appropriate basis for invocation of the continuing violations doctrine").

In this case, the plaintiff alleges that the initial seizure and prosecution were caused by ACS policies that are biased against abused mothers and in favor of unnecessary removals. The plaintiff alleges that the same policies motivated Brown's petitions in August 2000. The plaintiff also claims that Ortiz and Brown both made false allegations to the family court pursuant to an alleged ACS practice. As explained below, the existence of ongoing policies or practices and their application in this case are issues of fact, and the claims thus cannot be dismissed on summary judgment as time barred.

## VI.

■■■■■ To impose § 1983 liability upon a municipality, a plaintiff must identify a municipal "policy" or "custom" that caused the plaintiff's injuries. *See Monell v. Dept. of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *see also Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *Sorlucco v. N.Y. City Police Dep't*, 971 F.2d 864, 870 (2d Cir.1992); *Bullard v. City of New York*, 240 F.Supp.2d 292, 299–300 (S.D.N.Y.2003). The plaintiff must demonstrate that the municipality was the "moving force" behind the injuries alleged. *Brown*, 520 U.S. at 404, 117 S.Ct. 1382; *Monell*, 436 U.S. at 692, 98 S.Ct. 2018. The alleged policy

does not need to be contained in an explicitly adopted rule so long as the unlawful practices of city officials are so "persistent and widespread . . . as to constitute a custom or usage with the force of law." *Sorlucco*, 971 F.2d at 870–71 (internal quotations omitted).

■ The alleged policy at the heart of the action is that ACS makes unnecessary removals where mothers are victims of domestic violence. The plaintiff argues that the district court in *Nicholson* already found that this policy existed and was unconstitutional. *See generally Nicholson*, 203 F.Supp.2d at 207–21, 249–57; *see also Nicholson*, 344 F.3d at 165 ("The District Court did not abuse its discretion in finding that ACS's practice of effecting removals based on a parent's failure to prevent his or her child from witnessing domestic violence against the parent amounted to a policy or custom of ACS."). The City defendants argue that, even if the policy generally existed, the policy was not the moving force behind the prosecution of Velez.[11] The defendants contend that the petitions against Velez were also based on allegations of drug and alcohol abuse, educational neglect, and a failure to cooperate with ACS-recommended services. The Segal Report, however, explains that in some cases ACS would file neglect petitions based on domestic violence but would include other neglect charges that often would not be supported by credible evidence or would be insufficient in themselves to justify removing the children. (*See* Segal Report ¶¶ 9, 12.) Judge Segal concludes that Velez's case fits this pattern, and the evidence in the record is sufficient to raise an issue of fact on this question. (*See id.* ¶ 12. *See generally* Pl. 56.1 Stmt. ¶¶ 61–92 (citing evidence in record questioning basis for removal of plaintiff's children).)

The record also provides support for other policies and customs contributing to the alleged violations. For example, the Mundorff declaration states that ACS has a policy, manifest in ACS's mission statement and taught in caseworker training, of resolving all ambiguities in favor of finding abuse or neglect and of removing children. (Mundorff Decl. ¶¶ 4–6, 10.) This policy, Mundorff declares, results in a heavy bias toward making unnecessary removals and is compounded by the failure of ACS to provide coherent guidelines for making removals. (*Id.* ¶¶ 7–9.) The record also indicates that this policy extends to an ACS practice of making removals without seeking prior judicial authorization. (*See* Pl. 56.1 Stmt. ¶ 57 (citing Aug. 17, 2001 Test. of Scoppetta, attached as Bursor Decl. Ex. 1).)

In addition, the plaintiff has presented evidence of an ACS policy or practice of retaining children without legal authority after court-ordered placements have lapsed. The Mundorff Declaration cites statistics to show the pervasiveness of the problem. (Mundorff Decl. ¶ 15.) It further states that policies and practices at ACS-including an inadequate tracking system and a failure of ACS caseworkers to follow up after the initial placement with the contract agency-are contributing to the problem and that senior ACS policymakers are aware of the problem but have not sufficiently responded. (*Id.* ¶¶ 15–18.)

---

11. For the purposes of this motion, the City defendants do not dispute the correctness of the finding by Judge Weinstein in *Nicholson* of a policy or custom of ACS as to victims of domestic violence. Instead, the City defendants argue that the policy or custom was not the moving force behind the prosecution of the plaintiff in this case. The parties have not argued whether the finding in *Nicholson* has any preclusive effect in this case. In any event, as explained below, the plaintiff has presented sufficient evidence to withstand a motion for summary judgment on the existence of such a policy or custom.

Finally, the plaintiff alleges that Ortiz and Brown made false allegations in petitions and to the family court pursuant to a ACS policy or custom. Judge Segal's declaration generally supports this claim by stating that ACS caseworkers often failed "to present fair and accurate charges and information to the court" when filing their petitions. (Segal Decl. ¶ 12 (quoting *Nicholson*, 203 F.Supp.2d at 222).) In addition, the plaintiff points to similar paragraphs at the beginning of the petition "riders" signed by Ortiz and Brown. Both paragraphs allege, among other things, that the children's "physical, mental or emotional condition has been impaired or is in imminent danger of being impaired." (*See* Conway Decl. Exs. E (Ortiz petitions), K (Brown petitions).) Ortiz and Brown both testified in their depositions that these paragraph were based on form language and had been drafted by staff attorneys. (*See* Ortiz Dep. at 206–07; Brown Dep. at 65.) The City defendants argue that the paragraphs simply provide the legal definitions for neglect. *See* N.Y. Fam. Ct. Act § 1012(f)(i)(A)-(B). The plaintiff argues that the paragraphs exemplify an ACS practice of filing petitions without specific support for the charges and without a thorough review of the accuracy of the allegations. The significance of the paragraphs in this case is an issue of fact, but their use by both caseworkers and the testimony of the caseworkers indicates a practice in the preparation of petitions for which the City could be liable.

## VII.

The City also moves for summary judgment dismissing the claims against individual City defendants on the grounds that Ortiz and Brown are entitled to qualified immunity for their actions and on the grounds that Ortiz, Brown, Scoppetta, and Bell lacked the requisite personal involvement in the plaintiffs' case to be held liable under 42 U.S.C. § 1983.

## A.

 Under the doctrine of qualified immunity, government officials performing discretionary functions are generally shielded from liability for civil damages "if either (1) their conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable to believe that [their] acts did not violate these clearly established rights." *Tenenbaum*, 193 F.3d at 596 (alteration in original) (internal quotation omitted); *see also Evans v. City of New York*, 308 F.Supp.2d 316, 328 (S.D.N.Y.2004). "A right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right. That unlawfulness must be apparent." *McEvoy v. Spencer*, 124 F.3d 92, 97 (2d Cir.1997) (internal quotations and alterations omitted). Summary judgment on qualified immunity grounds is thus appropriate if a right is not clearly established or if

> no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[ ] to believe that he was acting in a fashion that did not clearly violate an established federally protected right.

*Robison v. Via*, 821 F.2d 913, 921 (2d Cir.1987) (alteration in original) (internal quotation omitted). Because child welfare caseworkers operate under difficult circumstances, protection from suit is essential to enable them to fulfill their duties. *See Tenenbaum*, 193 F.3d at 596–97. Thus "[t]he objective reasonableness test is met ... if officers of reasonable competence could disagree on the legality of the defendant's actions." *Id.* at 596 (internal quotation omitted).

 With respect to Ortiz's individual liability for the initial seizure, it was

clearly established long before 1998 that a hearing is generally required prior to removing a child, absent emergency circumstances involving an immediate threat of harm to the child. *See Tenenbaum,* 193 F.3d at 596; *Hurlman v. Rice,* 927 F.2d 74, 79 (2d Cir.1991); *Robison,* 821 F.2d at 921–22; *Bruker v. City of New York,* 92 F.Supp.2d 257, 269 (S.D.N.Y.2000). However, it was not until October 1999 that *Tenenbaum* "specifically held that where there is reasonable time consistent with the safety of the child to obtain a judicial order, the 'emergency' removal of a child is unwarranted." *Tenenbaum,* 193 F.3d at 596 (granting qualified immunity from liability under newly framed rule); *see also id.* at 607–08 (Jacobs, J., dissenting in part) (noting that prior precedent focused solely on child's peril but new rule focuses on ability to obtain court order).[12] Therefore, Ortiz cannot be liable under the current, more rigorous procedural requirement stated in *Tenenbaum;* but she may be subject to suit under the *Hurlman /Robison* principle if it was not objectively reasonable for her to believe that there was generally an "emergency" presenting an imminent threat of harm to the children.

While caseworkers often face difficult choices and need "adequate latitude to exercise their professional judgment," *Defore v. Premore,* 86 F.3d 48, 50 (2d Cir. 1996), a genuine issue of material fact exists as to whether Ortiz's seizure of the children was objectively reasonable. Courts, on motions for summary judgment, have often granted qualified immunity for emergency removals where the allegations directly involved abuse of the child. *See, e.g., id.* at 50–51 (finding hospitalization of child reasonable based on reports of abuse and child's subsequent suicide attempts); *Gottlieb,* 84 F.3d at 519 (involving allegations from source and statements by child that father was sexually abusing child); *Robison,* 821 F.2d at 922 (describing removal as based on reports of ongoing sexual abuse by father and on caseworkers' observations of children's reactions when asked about their father). In this case, however, there were not allegations that the children were being abused or that domestic violence was directed at them.

Ortiz's testimony in her deposition, viewed in the light most favorable to the plaintiff, indicates that she could not articulate a specific risk of harm to the children. (*See* Ortiz Dep. at 195–98.) She seized the children because, after the recent domestic violence incident, Velez had taken her children to stay with a friend and Ortiz "didn't know what the situation was with the children," including where and with whom the children were staying. (*See id.* at 197–98.) But the "mere 'possibility' of danger" does not justify an emergency removal. *See Hurlman,* 927 F.2d at 81 (finding that issues of fact prevented summary judgment on qualified immunity grounds); *see also Tenenbaum,* 193 F.3d at 594 (quoting *Hurlman*). Under the circumstances, where the children otherwise appeared healthy and there was no specifically identified direct threat to their safety, summary judgment is inappropriate on Ortiz's assertion of qualified immunity for the initial seizure of the children.[13]

---

12. The district court in *Tenenbaum* found that caseworkers did not violate procedural due process rights, as established in *Robison* and *Hurlman,* where there were allegations that the child was being sexually abused by her father. *See Tenenbaum v. Williams,* 862 F.Supp. 962, 969–72 (E.D.N.Y.1994), *aff'd in part and vacated in part,* 193 F.3d at 594–95 (disagreeing that "emergency circumstances" could be found without inquiring into ability to obtain prior judicial order).

13. The City defendants argue in their reply brief that the procedural due process claims as to the initial removal should be dismissed as a matter of law because there were "emer-

With respect to the prosecution of the plaintiff and removal of her children, ACS's policy toward battered mothers was not found unconstitutional until *Nicholson* in 2002. Even after the district court decision, the legality of prosecuting mothers for neglect based on domestic violence is unsettled, and Ortiz is thus entitled to qualified immunity on those claims. *See Nicholson,* 344 F.3d at 168, 176–77 (declining to resolve constitutional issues and certifying questions of statutory law to New York Court of Appeals); *Garcia v. Scoppetta,* 289 F.Supp.2d 343, 353 (E.D.N.Y.2003) (granting qualified immunity in malicious-prosecution action by one of *Nicholson* plaintiffs because "critical areas of the law in this field are not yet established"). However, the plaintiff also alleges that Ortiz made false statements in her petition and in her testimony to the family court. It was clearly established that it violates due process under the Fourteenth Amendment for a government official to give false testimony in a state court proceeding. *See Napue v. Illinois,* 360 U.S. 264, 270, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Based on evidence viewed in the light most favorable to the plaintiff, a jury could find that Ortiz made allegations of substance abuse that she knew were false and unsubstantiated, and Ortiz could be individually liable for that alleged false testimony.

With respect to the substantive and procedural due process claims against Brown, the City defendants argue only that Brown was objectively reasonable in filing the neglect petitions in August 2, 2000 based on the plaintiff's failure to attend drug rehabilitation and domestic vio-

lence counseling.[14] That argument, however, does not address the claims that Brown allowed the children to be retained without legal authority. The City's response also does not address claims that Brown's petitions included statements that were false and that she could not affirm. Issues of fact thus remain as to the objective reasonableness of Brown's actions.

In short, while Ortiz and Brown are entitled to qualified immunity on certain portions of the claims against them, as explained above, neither defendant in her individual capacity can be dismissed from the action.

## B.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (internal quotation omitted); *see also Evans,* 308 F.Supp.2d at 327–28. Ortiz directly participated in the initial seizure of the plaintiff's children and in the prosecution and proceedings leading their removal. While Brown was not employed with ACS when the initial placement lapsed in November 1999, she began working at ACS in January 2000, and in August 2000 she filed further petitions charging the plaintiff with neglect and seeking an extension of placement. There is sufficient evidence to establish Brown's personal involvement in the allegedly illegal retention of the children and in the second prosecution of the plaintiff.

---

gency circumstances" involving an imminent risk to the children. The argument was not raised in the initial motion papers and is thus not a basis for summary judgment. In any event, the City does not accurately state the procedural due process standard after *Tenenbaum,* and there are issues of fact even as

to whether the removal was reasonable under the *Hurlman/Robison* standard.

**14.** As with Ortiz, Brown is entitled to qualified immunity on claims relating to the policy of prosecuting abused mothers.

■■■■ With respect to Commissioners Scoppetta and Bell, the personal involvement of a supervisory defendant may be shown by evidence of "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). To satisfy the personal involvement requirement, the plaintiff has offered submissions by experts Segal and Mundorff, the source materials on which those experts rely, transcripts of testimony by Bell and Scoppetta given for *Nicholson* (Bursor Decl. Exs. 1–3), and memoranda drafted by Bell and Scoppetta (*id.* Exs. 25, 27–28). Evidence in the record establishes an issue of material fact as to the Commissioners' involvement in establishing or failing to correct the alleged policies and customs underlying the claims. (*See generally* Pl. 56.1 Stmt. ¶¶ 61–68, ¶¶ 149–52 (citing to record).)

## VIII.

The CDSC defendants' motion for summary judgment appears to be directed against the Complaint rather than the Amended Complaint. The CDSC defendants did not, until their reply brief, make any argument against the current Counts II and III, which assert claims of intentional infliction of emotional distress and negligence against CDSC and Reynolds. The plaintiff has had no reasonable opportunity to respond to such arguments, and the Court will not consider arguments raised for the first time on reply. Summary judgment as to Counts II and III is thus denied.[15]

■■■■ With respect to the constitutional claims (asserted in Count I in both the Complaint and Amended Complaint), the CDSC defendants also raise arguments under the *Rooker-Feldman* doctrine and the statute of limitations. For the reasons stated with respect to the City defendants' motion, summary judgment in favor of the CDSC defendants is not warranted on those grounds. The CDSC defendants further argue that they cannot be held liable for ACS's decision to remove the children because they were not involved in the case at the time. The plaintiff acknowledges that there can be no claim against CDSC based on the initial seizure on September 18, 1998. The CDSC defendants, however, may be liable for their actions after they became involved in the case, which occurred in October 1998. For example, there is an issue as to CDSC's duties to notify ACS or the plaintiff after the children's placement lapsed. The CDSC defendants have not set forth undisputed facts directed at the Amended Complaint sufficient to warrant summary judgment against the plaintiff's claims.[16]

## Conclusion

For the reasons explained above, the motions for summary judgment by the

---

15. The CDSC defendants also argue, apparently based on the Complaint, that John Velez and Steven Pagan lack the capacity to bring this action on their own behalf. The Amended Complaint makes it clear that the action is being brought by the plaintiff on behalf of herself and her minor children pursuant to Fed.R.Civ.P. 17 and N.Y. C.P.L.R. § 1201. (*See* Am. Compl. ¶ 5.)

16. The CDSC defendants' Notice of Motion indicates that they also seek summary judg-

ment in favor of cross-claims against the City defendants. The bases for such a motion were never clearly set forth in the motion papers. The City defendants did not respond to any such motion, and at the argument on the motions, the CDSC defendants did not raise the lack of a response or present argument on the motion on the cross-claims. To the extent there is such a motion, it is thus denied.

City defendants and CDSC defendants are **denied**, except that certain portions of the claims against Ortiz and Brown in their individual capacities are dismissed on qualified immunity grounds, as explained above, and the City defendants' motion for summary judgment is **granted** in that limited respect. To the extent that the CDSC defendants move for summary judgment in favor of their cross-claims against the City, that motion is also **denied**.

SO ORDERED.